**Rajaa Al MUKADDAM, Plaintiff,**

v.

**PERMANENT MISSION OF SAUDI ARABIA TO THE UNITED NATIONS, Defendant.**

**No. 99 Civ. 3354(LAK).**

United States District Court, S.D. New York.

Sept. 8, 2000.

Bobbi C. Sternheim, Rochman, Platzer, Fallick & Sternheim, LLP, for plaintiff.

Alexandra A.E. Shapiro, Matthew T. Martens, Latham & Watkins, for defendant.

Ralph Zacklin, Assistant Secretary–General for Legal Affairs, United Nations Office of Legal Affairs, for amicus curiae The United Nations.

Wendy H. Schwartz, Assistant United States Attorney, Mary Jo White, United States Attorney, Stephen D. McCreary, Office of Diplomatic Law and Litigation, United States Department of State, for amicus curiae United States Department of State.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Plaintiff Rajaa Al Mukaddam ("Mukaddam") was employed by the defendant Permanent Mission of Saudi Arabia to the United Nations (the "Mission") for over 14 years. Plaintiff contends that she was wrongfully terminated by the defendant in April 1998 following a pattern of harassment and gender discrimination that began in 1996 and asserts claims of wrongful termination and retaliation under Title VII

of the Civil Rights Act of. 1964[1] and the New York State Human Rights Law.[2]

The defendant contends that its status as the Permanent Mission of Saudi Arabia entitles it to immunity from suit in the United States and renders the statutes under which plaintiff sues inapplicable. It therefore moves to dismiss plaintiff's claims on the grounds that this Court lacks subject matter and personal jurisdiction and that plaintiff's complaint fails to state a claim upon which relief can be granted.

*Submissions by the United States and the United Nations*

Mindful of the diplomatic and sovereign immunity concerns raised by this case, the Court invited the United States Department of State and the Office of Legal Affairs of the United Nations to express any views they might have on the Mission's motion to dismiss.[3]

The Department of State submitted a Statement of Interest in which it set forth the United States' view on the parameters of immunity to suit of Saudi Arabia under the Foreign Sovereign Immunities Act ("FSIA")[4] and the Vienna Convention on Diplomatic Relations and Optional Protocol on Disputes (the "Vienna Convention").[5] In a thorough analysis of the FSIA and relevant case law, the United States concluded that jurisdiction is determined by the FSIA and depends on whether the FSIA's "commercial activity" exception applies to this case. That, in turn, depends on whether the Court finds that plaintiff was a member of the Saudi Arabian civil service.[6] The United States does not interpret Article 7 of the Vienna Convention as providing immunity from claims by employees of diplomatic missions, but rather as limiting receiving states from imposing restrictions, other than those set forth in the articles enumerated in Article 7, on the acceptance of mission personnel.[7] The United States acts consistently with this view and defends cases in foreign courts involving conditions of employment or discharge at its diplomatic and consular missions in other countries, generally considering them to be commercial in nature.[8]

The United Nations submitted a letter setting forth its position that any measure, such as legal process, that might impede the maintenance of Permanent Missions to the United Nations or their ability to discharge their official functions would contravene the Charter of the United Nations and the Agreement between the United Nations and the United States of America regarding the Headquarters of the United Nations.[9] In addition, the United Nations interprets the Vienna Convention's grant of authority to "freely appoint" mission staff[10] as extending to the freedom to decide whether to continue or terminate such appointments and finds that subjecting such decisions to the jurisdiction of the receiving state would violate the sending state's sovereign immunity. The United Nations concluded that this case does not arise out of commercial activities of Saudi Arabia and that the exercise of jurisdiction in this case would contravene all three of the aforementioned international agreements.

The Court appreciates and has considered each of these submissions, as well as

---

1. 42 U.S.C. § 2000e *et seq.*

2. N.Y.Exec.Law § 290 *et seq.* (McKinney 1993).

3. Court Order, dated July 26, 2000.

4. 28 U.S.C. § 1602 *et seq.*

5. *Opened for signature* Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95 (entered into force with respect to U.S. Dec. 13, 1972).

6. U.S. Statement 4–16.

7. *Id.* at 19.

8. *Id; see also* Jacobson Decl. (attached to U.S. Statement).

9. *Reprinted at* 22 U.S.C.A. § 287.

10. Vienna Convention, Art. 7.

the international agreements that they cite, in deciding this motion.

*Standard for Dismissal under Rule 12(b)(1), (2) and (6)*

In resolving a motion to dismiss, the Court must accept as true the factual allegations set forth in the complaint and draw all reasonable inferences in favor of plaintiff.[11] A complaint may not be dismissed under Rule 12 "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief."[12] In other words, the issue before the Court on this motion to dismiss "is not whether ... plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support [her] claims."[13]

As an additional matter, the Court will consider the plaintiff's employment contract in the Rule 12 dismissal determination. Rule 12(b) motions are made solely upon the pleadings.[14] In passing on such a motion, however, the Court may consider also those documents to which plaintiff refers in the complaint.[15] Plaintiff's employment contract is incorporated by reference in the complaint and therefore is properly considered by the Court in deciding this motion.[16]

*Discussion*

The Mission argues that plaintiff's suit is barred by the Foreign Sovereign Immunities Act ("FSIA") and the Vienna Convention on Diplomatic Relations (the "Vienna Convention") and, in any case, that it is not an "employer" within the meaning of either Title VII or the New York Human Rights Law. Additionally, the Mission argues that, under the FSIA, there is no right to jury trial in actions against foreign states and moves to strike plaintiff's jury demand.[17]

*A. The Foreign Sovereign Immunities Act*

Traditionally, foreign states have enjoyed broad sovereign immunity from suit in United States courts. In 1976 Congress enacted the FSIA, codifying a "restrictive theory" of sovereign immunity, and established it as the sole basis for obtaining subject matter jurisdiction over a foreign state, its agencies, or its instrumentalities.[18] Under the FSIA a foreign state is immune from suit in the United States absent an express waiver of immunity or an applicable statutory exception.[19] Where there is no immunity, the federal district courts have subject matter jurisdiction over nonjury civil actions against foreign states and their instrumentalities and, if service of process is made in accordance with the FSIA, there is personal jurisdiction over the foreign defendant.[20]

The parties agree that the defendant is a foreign state, or an agency or instrumen-

**11.** *See Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996).

**12.** *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

**13.** *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995) (citation omitted), *cert. denied,* 519 U.S. 808, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996).

**14.** Fed.R.Civ.P. 12(b).

**15.** *See International Audiotext Network, Inc. v. AT & T Co.,* 62 F.3d 69, 72 (2d Cir.1995).

**16.** *See, e.g., Aiena v. Olsen,* 69 F.Supp.2d 521, 525 (S.D.N.Y.1999) (citing *Strom v. Goldman, Sachs & Co.,* 202 F.3d 138, 140 n. 1 (2d Cir.1999)). The employment contract is attached as Exhibit A to Plaintiff's Mem. of Law in Opposition to Defendant's Motion to Dismiss ("Pl.Mem.").

**17.** Def.Mem. 1.

**18.** *See Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 611, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992); *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 439, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989); 14A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure: Jurisdiction 3d § 3662 (3d ed.1998) (hereinafter Wright).

**19.** 28 U.S.C. §§ 1604, 1605.

**20.** *Id.* § 1330(b).

tality of a foreign state, within the meaning of the FSIA.[21] Thus, the FSIA applies to this action and, since the Mission has not waived immunity, it is immune from suit unless one of the FSIA's statutory exceptions applies.[22] The exception that plaintiff seeks to invoke is found at 28 U.S.C. § 1605(a)(2) and covers cases involving commercial activities of a foreign state that either take place or have a direct effect in the United States.[23]

### 1. Exceptions to Immunity Under § 1605(a)(2)

The language of Section 1605(a)(2) is precise and should be construed narrowly.[24] It provides:

"A foreign state or its instrumentalities shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

\* \* \* \* \* \*

"(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that

act causes a direct effect in the United States;
. . . ." [25]

Plaintiff relies on the first clause of this subsection and argues that the commercial activity relevant to this action is her employment by the Mission.[26] The Mission disputes that its employment of plaintiff constituted commercial activity, asserting that she was employed as a professional civil servant whose duties were to carry out a foreign policy function.[27]

### 2. Was Plaintiff's Employment Commercial Activity?

Commercial activity is defined in the FSIA as "a regular course of commercial conduct or a particular commercial transaction or act." [28] The statute goes on to state that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." [29] Thus, in determining whether a specific act is commercial, courts first must determine the *nature* of the act, considering its purpose "only so far as is absolutely necessary to define the nature of the act in question." [30] In making this determination, an important inquiry is whether the specific act under consideration is one in which private parties normally engage.[31] An af-

---

**21.** *See* Def.Mem. 1–2; Pl.Mem 3; *see also* 28 U.S.C. § 1603.

**22.** *See* 28 U.S.C. § 1605.

**23.** *Id.* § 1605(a)(2).

**24.** 14A WRIGHT § 3662.

**25.** 28 U.S.C. § 1605(a)(2).

**26.** Pl.Mem. 3–4.

**27.** Def.Mem. 6–9.

**28.** 28 U.S.C. § 1603(d).

**29.** *Id.*

**30.** *Segni v. Commercial Office of Spain,* 835 F.2d 160, 164 (7th Cir.1987).

**31.** *See Saudi Arabia v. Nelson,* 507 U.S. 349, 360, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993); *Republic of Argentina v. Weltover,* 504 U.S. at 613–15, 112 S.Ct. 2160; *Rush–Presbyterian– St. Luke's Medical Ctr. v. Hellenic Republic,* 877 F.2d 574, 578 (7th Cir.), *cert. denied,* 493 U.S. 937, 110 S.Ct. 333, 107 L.Ed.2d 322 (1989); *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 309–10 (2d Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982).

The Seventh Circuit has read the Second Circuit's opinion in *Letelier v. Republic of Chile,* 748 F.2d 790, 797 (2d Cir.1984), as requiring a profit motive on the part of the foreign sovereign in order to find that an activity is commercial. *See Rush–Presbyterian,* 877 F.2d at 578 n. 4. The Second Circuit has rejected this reading of *Letelier,* and reiterated that the relevant inquiry is whether the act is the type

firmative answer indicates a commercial act, upon which suit against a foreign sovereign may be based, as opposed to a public or governmental act, which is immunized from suit.

Plaintiff's duties during her employment with the Mission are not in dispute. They included writing speeches that Saudi government officials delivered to the United Nations and were published in local newspapers, establishing and maintaining a data bank classification system, establishing a system for registering and responding to correspondence to and from the Mission, drafting correspondence and public statements, writing memos, letters, faxes and reports to the Ministry of Foreign Affairs in Saudi Arabia and, on one occasion, speaking with students concerning Saudi Arabia's public positions on international issues.[32] The parties' disagree, however, about the appropriate characterization of these duties. The Mission asserts that plaintiff was a civil servant and that its employment of her was not the type in which a private party would engage.[33] Plaintiff responds that she was not a civil servant[34] or diplomatic officer and that

she was hired to perform public relations and clerical duties.[35]

### a. Was Plaintiff a Civil Servant or Member of the Mission's Diplomatic Personnel?

The legislative history of the FSIA indicates that Congress considered the employment of "diplomatic, civil service, or military personnel" to be "governmental and not commercial in nature."[36] Thus, if plaintiff was either a civil servant or a diplomatic officer, her employment would not have been commercial in nature and the FSIA's commercial acts exception to sovereign immunity would not bring plaintiff's lawsuit against the Mission within the jurisdiction of this Court.

In deciding whether an individual's employment by a foreign state constitutes civil service, courts have considered whether the employee competed for an examination prior to being hired, was entitled to tenure, was provided the same benefits as foreign service officers, or received civil service protections from the hiring government.[37] Nothing in the pleadings or plain-

---

of act in which a private person would engage. *Weltover, Inc. v. Republic of Argentina,* 941 F.2d 145, 149–50 (2d Cir.1991), *aff'd,* 504 U.S. 607, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992).

**32.** *See* Pl.Mem. 9–10; Def.Mem. 2, 8–9 (citing to facts alleged in the Complaint).

**33.** Def.Mem. at 8–9.

**34.** In a memorandum of law written by plaintiff, *pro se,* in response to this Court's order to show cause why the case should not be dismissed for lack of subject matter jurisdiction and failure to state a claim, plaintiff asserted that she was a civil servant. She cited no authority for this conclusion. Because the Court has found nothing in the record that establishes conclusively that plaintiff was, in fact, a civil servant, it declines to hold plaintiff to this assertion. Absent documentation or proof of civil service status, this is a legal conclusion that plaintiff, unrepresented by counsel, was not qualified to make. Since obtaining counsel, plaintiff has withdrawn this assertion. *See* Pl.Mem. at 8 n. '1. In consequence, the Court will determine for

itself whether the employment in question was in the nature of civil service.

**35.** Pl.Mem. 8–9.

**36.** H.R.Rep. No. 94–1487, at 16 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6615.

**37.** *See Holden v. Canadian Consulate,* 92 F.3d 918, 921 (9th Cir.1996), *cert. denied,* 519 U.S. 1091, 117 S.Ct. 767, 136 L.Ed.2d 713 (1997). Some additional questions recently have been suggested by the D.C. Circuit as relevant. They include: (1) How does the foreign state's law define its civil service? (2) Was there a contractual relationship between the employee and the foreign sovereign or did the employment relationship depend upon civil service laws? (3) Is the foreign state a country in which non-nationals are unlikely to be employed as governmental officers? *See El–Hadad v. United Arab Emirates,* 216 F.3d 29, 34 (D.C.Cir.2000). The D.C. Circuit remanded the case to the district court, which had dismissed it on the pleadings, for further inquiry into these areas. This Court does not have before it any evidence relating to Saudi Ara-

tiff's employment contract indicates that any of these conditions applies to plaintiff's employment.

Although the defendant characterizes plaintiff's employment contract as a "standard civil service contract,"[38] the contract itself is entitled "Contract of Employment Between Ministry of Foreign Affairs (Government of Saudi Arabia) and Rajaa Al-Mukaddam" and states that it is a "contract of employment for employees of representatives' offices and offices of attaches abroad."[39] The contract was for a term of one year, renewable automatically, and provided that Mukaddam was employed by the Mission "in a researcher position," which included the following duties:

"a) research work and studies

b) assigned clerical duties

c) obedience to supervisors, and performance of work with loyalty in the best possible manner.

d) avoidance of any disturbance that affect the continuation of this contract, good conduct with others, and respect of job confidentiality.

e) any other duties requested."[40]

In exchange for performance of these duties, the contract provided that Mukaddam would be paid a monthly salary of $3,300 and would receive various other benefits including sick leave, vacation, and social security contributions as required by U.S. law.[41]

The contract does not establish that Mukaddam was a civil servant of the government of Saudi Arabia. To the contrary, the contract appears to establish that plaintiff was a contract employee hired to conduct research and perform other clerical duties. There is no indication that she competed for an examination prior to being hired, had tenure, received the same benefits as foreign service officers, or received civil service protections from the Saudi Arabian government.[42] In light of the above, the Court finds plaintiff's employment is not properly categorized as civil service.

■ The Mission asserts also that plaintiff was engaged in work of a diplomatic nature and that her employment, therefore, was not commercial activity. In determining whether an employee is a member of the diplomatic personnel of a foreign country, courts look to whether the employee was involved in the creation or administration of government policy, privy to governmental policy deliberations, or engaged in lobbying or legislative work on behalf of, or authorized to speak for, the foreign sovereign.[43]

Although plaintiff drafted speeches and statements that set forth Saudi Arabia's governmental policy and positions, and once spoke to a group of students about Saudi Arabia's position on various international issues,[44] she contends, and defendant does not deny,[45] that she was not privy to policy deliberations or formation, did not engage in legislative or lobbying activities, and was not authorized to speak on behalf of the government of Saudi Arabia.[46] Furthermore, she alleges that her physical presence and movement in the Mission were restricted because she was neither a Saudi Arabian citizen nor a member of the

---

bian civil service law or customary employment of non-nationals as government officers. In light of the employment contract, however, this information, while perhaps helpful, is not necessary.

38. Def Reply Mem. 2 (citing plaintiff's *pro se* brief as support for this contention).

39. Pl.Mem., Ex. A.

40. *Id.* ¶ 1.

41. *Id.* ¶¶ 6–13.

42. *See Holden*, 92 F.3d at 921–22.

43. *See id.* at 921–22; *Segni*, 835 F.2d at 165.

44. Pl.Mem. 9–10.

45. *See* Def. Reply Mem. 4.

46. Pl.Mem. 9.

diplomatic staff.[47] In consequence, there is no basis for concluding as a matter of law that plaintiff served as a member of the Mission's diplomatic personnel.

■ Since the Court has not found that plaintiff was a member of the Mission's civil service or diplomatic personnel, her employment cannot automatically be characterized as governmental or public in nature. Along those same lines, plaintiff's argument that her American citizenship automatically qualifies her employment with the Mission as commercial also fails.[48]

### b. Plaintiff's Citizenship

Plaintiff erroneously relies on language found in the legislative history of the FSIA and *Broadbent v. Organization of American States*[49] in asserting that, because she is an American citizen, her employment by the Mission must be commercial activity.[50] She is not the first to do so.

The troublesome language found in the House Report on the FSIA is as follows:

"Also public or governmental and not commercial in nature, would be the employment of diplomatic, civil service, or military personnel, *but not the employment of American citizens* or third country nationals by the foreign state in the United States."[51]

In *Broadbent*, the District of Columbia Circuit interpreted this language to create "an exception from the general rule" that civil service employment is not commercial activity "in the case of employment of American citizens or third country nationals...."[52] This exception, on occasion, has been applied to determinations of whether employment is commercial or governmental in nature.[53] The D.C. Circuit, however, has abandoned this position, stating in *El–Hadad v. United Arab Emirates*[54] that the language from *Broadbent* on which plaintiff relies was "plainly dictum" and that a "per se rule of non-immunity for a foreign state's employment of third country nationals is inconsistent with Congress' intent to immunize foreign governmental activity from suit in American courts."[55] So holding, the court went on to state that it is possible that the language of the House Report at issue reflected Congressional intent to contrast civil service employment with non-civil service employment, operating on the assumption that it was unlikely that a country would employ an American or third country national in a civil service position. The court concluded that, in any event, the language that must control its decision is that of the statute itself and not its "somewhat muddy legislative history."[56]

■ This Court finds the logic of *El–Hadad* persuasive. As the statute makes no mention of an exception from immunity for employment of Americans or third country nationals,[57] the Court may not cre-

---

**47.** *Id.* This was a factor considered by the Ninth Circuit in finding plaintiff's employment to be commercial rather than diplomatic. *See Holden*, 92 F.3d at 922.

**48.** Pl.Mem. 6–8.

**49.** 628 F.2d 27 (D.C.Cir.1980).

**50.** Pl.Mem. 6–8.

**51.** H.R.Rep. No. 94–1487, at 16 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6615 (emphasis added).

**52.** *Broadbent*, 628 F.2d at 34.

**53.** *See, e.g.*, *Segni*, 835 F.2d 160, 165 n. 7 (considering employee's status as a "third country national" as a factor relevant to the commercial nature of employment); *Elliott v. British Tourist Authority*, 986 F.Supp. 189, 193–94 (S.D.N.Y.1997) (although not finding plaintiff a civil servant or diplomat, stating that in any case his American citizenship "would place his employment beyond the scope of immunized 'noncommercial' employment of civil servants"), *aff'd*, 172 F.3d 37, 1999 WL 38836 (2d Cir.1999).

**54.** 216 F.3d 29 (D.C.Cir.2000).

**55.** *Id.* at 33.

**56.** *Id.*

**57.** *See* 28 U.S.C. § 1605(a)(2).

ate such an exception. In consequence, the fact that plaintiff is an American and not a Saudi Arabian citizen is but one factor to be considered in determining the nature of her employment.

### c. The Nature of Plaintiff's Employment

■ Having rejected both parties' contentions as to the automatic categorization of plaintiff's employment, the Court now proceeds to determine the nature of plaintiff's employment, keeping in mind the critical question of whether a private party, as opposed to a sovereign, could have engaged in an identical employment relationship with plaintiff. In so doing, it is important to focus on the specific conduct at issue, rather than the broader program of which this individual employment relationship was a part, and to concentrate on the basic exchange embodied in the contract.[58] Applying these guiding principles, the Court looks beyond defendant's assertion that plaintiff was hired by the Mission to carry out the diplomatic affairs of Saudi Arabia and focuses on the Mission's specific act of entering into an employment contract with plaintiff to perform research, writing, and clerical duties on its behalf. The question that this Court must answer is whether private parties enter into employment contracts to do the same. Because it is clear that private parties in the United States enter into such contracts routinely, the Court finds that plaintiff's employment with the Mission was commercial, as opposed to governmental, activity. That plaintiff is an American citizen and was hired in New York give additional weight to this conclusion.

■ The Court rejects defendant's argument that it must consider the broader context of plaintiff's employment and whether it was designed to fulfill a sovereign function. The relevant statute,[59] as well as subsequent case law,[60] makes clear that this is not the case. Thus, the Mission's argument that private parties do not maintain a staff to articulate or carry out foreign policy is irrelevant, as it focuses on the purpose behind plaintiff's employment rather than the Mission's specific conduct of employing her to perform the aforementioned duties.

Having found that plaintiff was neither a civil servant nor a diplomatic officer, and that her employment was commercial activity, this Court holds that the Mission's employment of plaintiff constitutes commercial activity within the meaning of the FSIA. Since this activity took place in the United States, and plaintiff's discriminatory discharge and retaliation claims are based upon this activity,[61] the Court holds that plaintiff's allegations, if proved, would establish that her employment comes within the commercial activity exception to the FSIA.

### B. International Treaty

The Mission argues that in addition to proving that her suit falls within one of the FSIA's exceptions, the FSIA requires plaintiff to demonstrate that no international agreement bars her action.[62] The Mission contends that plaintiff has not done so because she did not respond to its argument that the exercise of jurisdiction in this case would "derogate traditional diplomatic immunities codified in the Vienna Convention." [63]

---

58. See Rush–Presbyterian, 877 F.2d at 580.

59. 28 U.S.C. § 1603(d).

60. See, e.g., Rush–Presbyterian, 877 F.2d at 578–81; Texas Trading & Milling Corp., 647 F.2d at 310.

61. See Zveiter v. Brazilian National Superintendency of Merchant Marine, 833 F.Supp.

1089, 1094 (S.D.N.Y.1993) (allegations of sexual harassment are "necessarily 'based upon'" defendant's employment of plaintiff).

62. Def. Reply Mem. 1.

63. Def.Mem. 5; Def. Reply Mem. 2.

 Although the Mission is correct in asserting that jurisdiction may be limited by treaty,[64] its reliance on the FSIA for the proposition that plaintiff has the burden of proving that no international agreement bars her action is misplaced.[65] Plaintiff met her burden of pleading jurisdiction by alleging facts that satisfied one of the FSIA's statutory exceptions to immunity.[66] Nonetheless, jurisdiction under the FSIA is "[s]ubject to existing international agreements to which the United States [was] a party at the time of enactment of [the FSIA]" [67] and the Court has an obligation to examine any such agreement that might affect the existence of subject matter jurisdiction over this action.[68]

The FSIA was enacted in 1976, four years after the United States became a party to the Vienna Convention. In consequence, the FSIA is subject to the Vienna Convention as a pre-existing international agreement, and the Court must consider its application in deciding whether jurisdiction exists to adjudicate this matter.

### 1. The Vienna Convention

The Vienna Convention was opened for signature in 1961 and signed by the President of the United States in 1972.[69] By its terms, diplomats and their household family members enjoy absolute immunity from criminal prosecution and, with three limited exceptions, immunity from civil suit.[70]

64. *See Whitney v. Robertson,* 124 U.S. 190, 194, 8 S.Ct. 456, 31 L.Ed. 386 (1888) ("By the constitution, a treaty is placed on the same footing, and made of like obligation, with an act of legislation.").

65. 28 U.S.C. § 1330(a) states that district courts shall have original jurisdiction over any nonjury civil action against a foreign state "with respect to which the foreign state is not entitled to immunity *either* under sections 1605–1607 of this title *or* under any applicable international agreement." 28 U.S.C. § 1330(a) (emphasis added). In deciding whether this language places a burden on plaintiff to demonstrate that no international agreement bars her action, as defendant suggests that it does, the Court follows basic principles of statutory construction and looks first to the plain language of the statute. *See, e.g., Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 475, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992) ("the beginning point must be the language of the statute . . . ."). If it is clear and unambiguous, and if there is no clear legislative intent to the contrary, the plain language controls. *See, e.g., In re: Air Crash Off Long Island, New York, on July 17, 1996,* 209 F.3d 200, 220 (2d Cir.2000); *Quaker State Oil Refining Corp. v. United States,* 994 F.2d 824, 832 (Fed.Cir.1993) ("It is a longstanding rule of statutory construction that the plain meaning of a statute is controlling absent clear legislative intent to the contrary."). The Court concludes that Section 1330(a) does not place a burden on plaintiff to demonstrate that no international agreements bar her action.

66. *See, e.g., Cargill Int'l S.A. v. M/T Pavel Dybenko,* 991 F.2d 1012, 1016 (2d Cir.1993)

("Once the defendant presents a prima facie case that it is a foreign sovereign, the plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted, although the ultimate burden of persuasion remains with the alleged foreign sovereign.") (citations omitted).

67. 28 U.S.C. § 1604. *See 767 Third Ave. Assoc. v. Permanent Mission of the Republic of Zaire to the United Nations,* 988 F.2d 295, 297 (2d Cir.) ("Because of [an identical provision in 28 U.S.C. § 1609] the diplomatic and consular immunities of foreign states recognized under various treaties remain unaltered by the [FSIA]."), *cert. denied,* 510 U.S. 819, 114 S.Ct. 74, 126 L.Ed.2d 42 (1993).

68. *See* 13A WRIGHT, JURISDICTION 2D § 3536 at 535 (2d ed. 1984) ("If the jurisdiction of a federal court is questioned, the court has the power and the duty . . . to determine the jurisdictional issue.").

69. *See* Vienna Convention, Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95 (attached as Ex. 1 to Affirmation of Alexandra A.E. Shapiro). Congress expressly incorporated the Vienna Convention into the Diplomatic Relations Act of 1978. *See* 22 U.S.C. § 254a–e.

70. *See* Vienna Convention, Art. 31(1) (a diplomatic agent enjoys immunity from civil suit except in cases of (a) a real action relating to private, immovable property situated in the receiving state, unless the property is held on behalf of the sending state for purposes of the mission, (b) an action relating to succession

In addition, the convention declares the premises of a mission inviolable.[71]

The defendant asserts that Article 7 of the Vienna Convention applies to this action and provides it with absolute immunity from any legal challenge with respect to the hiring and firing of Mission staff.[72] Article 7 provides, in relevant part, that "[s]ubject to the provisions of Articles 5, 8, 9, and 11, the sending State may freely appoint the members of the staff of [its] mission." [73] The term "members of the staff of the mission" is defined to include "members of the diplomatic staff, of the administrative and technical staff and of the service staff of the mission." [74]

▮▮▮ The Mission's interpretation of Article 7 is overly broad and ignores the context of the language upon which it relies. The provisions to which Article 7 is subject address issues such as the accreditation of the head of a mission and the appointment of diplomatic staff,[75] notice to the receiving state of the same,[76] the receiving state's rights to declare an individual "persona non grata," [77] and the need for a mission to stay within reasonable size.[78] Read in context,[79] Article 7 simply

provides that the sending state may appoint its own staff without approval of the receiving state unless one of the restrictions enumerated in Articles 5, 8, 9, or 11 applies. For example, Article 8 provides that a sending state may not appoint a citizen of the receiving state as a diplomatic staff member without the consent of the receiving state.[80] This reading does not approach the Mission's interpretation of Article 7 as providing an "absolute grant of immunity" from "any legal challenge to the hiring and firing of Mission staff." [81]

*Ford v. Clement,*[82] cited by defendant in support of its contention, is not to the contrary. That was an action brought by a former vice-consul of the Republic of Panama against the Panamanian Consul General, the U.S. State Department, and the Republic of Panama for harms resulting from a "campaign of harassment" that ultimately lead to her discharge.[83] The court there held that the Consul General was protected by consular immunity for actions he " 'performed in the exercise of' his consular functions of managing and supervising the consular staff" and therefore dismissed the action against him.[84] The action was not, how-

---

not on behalf of the sending state, or (c) an action relating to any professional or commercial activity outside of a diplomat's official functions); 37(1) (extending immunity to members of the household family of a diplomatic agent).

71. *Id.*, Art. 22.

72. Def.Mem. 6.

73. Vienna Convention, Art. 7.

74. *Id.*, Art. 1(c).

75. *Id.*, Art. 5 and 8.

76. *Id.*, Art. 5.

77. *Id.*, Art. 9.

78. *Id.*, Art. 11.

79. *See, e.g., Randolph v. Hendry,* 50 F.Supp.2d 572, 577 (S.D.W.Va.1999) ("A fundamental tenet of treaty construction is that the words

be read in overall context."). *Cf. Textron Lycoming Reciprocating Engine Div., AVCO Corp. v. United Automobile, Aerospace and Agricultural Implement Workers of America,* 523 U.S. 653, 657, 118 S.Ct. 1626, 140 L.Ed.2d 863 (1998) ("[I]t is a fundamental principal of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used.") (internal quotations omitted).

80. *Id.*, Art. 8.

81. Def.Mem. 6.

82. 834 F.Supp. 72 (S.D.N.Y.1993), *aff'd,* 29 F.3d 621, *cert. denied,* 513 U.S. 974, 115 S.Ct. 449, 130 L.Ed.2d 359 (1994).

83. *Id.* at 74.

84. *Id.* at 77.

ever, dismissed against the Republic of Panama on the same grounds.[85] In fact, the *Ford* court did not examine the applicability of the Vienna Convention on Consular Relations [86] to the Republic of Panama, but instead dismissed the complaint against the foreign sovereign because the plaintiff had identified Panama as a "possible" defendant in the complaint but never actually stated a cause of action against it or satisfactorily served it.[87] Furthermore, in determining that the consular officer was immune from suit, the *Ford* court did not rely on the clause of the Vienna Convention on Consular Relations that corresponds to the clause of the Vienna Convention on Diplomatic Relations that defendant seeks to invoke in this case. Rather, it relied on Article 43, which protects consular officers and employees from suit with respect to acts performed in the exercise of consular functions,[88] and not Article 19(1), which is nearly identical to Article 7 of the Vienna Convention on Diplomatic Relations.[89] Hence, *Ford* is not inconsistent with the Court's interpretation of Article 7.

The broad grant of immunity that the defendant seeks to invoke is simply not found in the Vienna Convention on Diplomatic Relations. The Vienna Convention provides immunity to diplomatic agents and their families, but not to foreign states or their Missions, except in particular circumstances.[90] And just as the FSIA does not affect "either diplomatic or consular immunity," [91] neither does diplomatic or consular immunity affect foreign sovereign immunity under the FSIA.[92] If jurisdiction over a foreign sovereign, or an agency or instrumentality of that sovereign, is properly asserted under the provisions of the FSIA, as the Court has found that it is here, the Vienna Convention does not immunize that sovereign or its instrumentali-

85. *Id.*

86. Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261. The Vienna Convention on Consular Relations came into force in the United States in 1969 and follows the Vienna Convention on Diplomatic Relations in many respects. *See* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 465 n. 1 (1987).

87. *Ford*, 834 F.Supp. at 77.

88. Vienna Convention on Consular Relations, Art. 43(1). There is no identical provision in the Vienna Convention on Diplomatic Relations. This is because the immunity of diplomatic agents is even broader than that of consular officers and shields a diplomatic agent from jurisdiction in any criminal action as well as all civil and administrative actions, with three exceptions. *See supra* note 70.

89. Vienna Convention on Consular Relations, Art. 19(1) ("Subject to the provisions of Articles 20, 22 and 23, the sending State may freely appoint the members of the consular staff."). Articles 20, 22, and 23 of the Vienna Convention on Consular Relations contain nearly the same provisions as Articles 5, 8, 9, and 11 of the Vienna Convention on Diplomatic Relations, to which Article 7 is subject.

90. *See, e.g.,* Vienna Convention, Art. 22 ("The premises of the mission shall be inviolable.").

91. *Lafontant v. Aristide*, 844 F.Supp. 128, 136 (E.D.N.Y.1994) (quoting H.R.REP. No. 94–1487, at 12 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6610).

92. *See Joseph v. Office of the Consulate General of Nigeria*, 830 F.2d 1018 (9th Cir.1987) (FSIA governs dispute with foreign consulate; immunity of consular officer is determined by Vienna Convention on Consular Relations), *cert. denied*, 485 U.S. 905, 108 S.Ct. 1077, 99 L.Ed.2d 236 (1988); *Logan v. Dupuis*, 990 F.Supp. 26, 27 n. 2 (D.D.C.1997) (finding FSIA inapplicable to action against consular officer based on acts not in furtherance of his consular function); *Foxworth v. Permanent Mission of the Republic of Uganda to the United Nations*, 796 F.Supp. 761, 764 (S.D.N.Y. 1992) (Vienna Convention on Diplomatic Relations does not immunize foreign state from being haled into court for tortious conduct; FSIA controls determination of jurisdiction); *York River House v. Pakistan Mission to the United Nations*, No. 99 Civ.2071(PNL), 1991 WL 206286, at *1 (S.D.N.Y. Sept. 27, 1991) (finding jurisdiction over Mission under the FSIA; granting motion to dismiss action against diplomatic agent based on immunity provided by Vienna Convention on Diplomatic Relations but holding Vienna Convention did not apply to foreign sovereign's motion to dismiss).

ty from suit.[93] In consequence, the Vienna Convention does not prevent the Court from exercising jurisdiction in this case.[94]

### C. The Mission is an Employer Under the Applicable Statutes

Defendant argues that it is not an employer within the meaning of either statute under which plaintiff brings suit.[95]

#### 1. Title VII of the Civil Rights Act of 1964

The Mission's argument with regard to Title VII is that its application to the Mission would implicate foreign policy, a "traditionally sensitive area" in which courts ought not interfere absent clear congressional intent.[96] The defendant asserts that this intent is lacking because Congress did not expressly include foreign governments or foreign diplomatic missions in the statute's definition of "employer" and, therefore, Title VII does not apply to such entities' commercial employment activities in this country.[97]

■■■ Defendant's argument is mistaken. The FSIA provides explicitly that: "[a]s to any claim for relief with respect to which a foreign state is not entitled to immunity under ... this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances...."[98]

The Court has found that the Mission is not immune from suit under the FSIA. Whether the Mission is considered an agency or instrumentality of Saudi Arabia, or an arm of the Saudi Arabian government itself, it is a "foreign state" within the meaning of the FSIA.[99] It therefore is liable under Title VII in the same manner and to the same extent as a private employer would be in like circumstances.[100]

■■■ Moreover, an examination of the provisions of Title VII makes clear that Congress considered its application to foreign entities operating in the United States and abroad, and decided to exclude their operations outside of the United States but not those within our borders.[101] The section of Title VII entitled "Applicability to foreign and religious employment" provides that Title VII does "not apply to the foreign operations of an employer that is a foreign person not controlled by an American employer."[102] From Congress' clear statement that Title VII does not apply to foreign entities operating outside of the United States, the Court concludes

---

**93.** *Cf. Holden,* 92 F.3d at 919 (affirming denial of motion to dismiss wrongful termination action against foreign consulate because employment fell within FSIA's commercial activity exception to immunity; court did not consider application of Vienna Convention on Consular Relations in spite of a provision identical to Article 7 of the Vienna Convention on Diplomatic Relations).

**94.** In addition to the Vienna Convention, the Court considered both the United Nations Charter and the Agreement between the United Nations and the United States of America Regarding the Headquarters of the United Nations and does not find either document to be material to this case.

**95.** Def.Mem. 15–24.

**96.** *Id.* at 15.

**97.** *Id.* at 18.

**98.** 28 U.S.C. § 1606.

**99.** *Id.* § 1603(a).

**100.** *See also First National City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 620–21, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) (holding that the FSIA does not affect the substantive law determining liability of a foreign state).

**101.** *See Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co.,* 529 U.S. 193, 120 S.Ct. 1331, 1339, 146 L.Ed.2d 171 (2000) (Congress demonstrated a restrictive intent as to the geographic reach of Title VII, as evidenced by the lack of extraterritorial venue and other enforcement mechanisms in the statute) (citing *EEOC v. Arabian American Oil Co.,* 499 U.S. 244, 256, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991)).

**102.** 42 U.S.C. § 2000e–1(c)(2).

the inverse—that is, that Title VII was intended to apply to the U.S. activities of foreign employers.[103] And Congress did not expressly exempt foreign governments or their diplomatic missions from this application of Title VII as it did foreign employers operating abroad. In the absence of such an exemption, and in light of the general purpose of the law,[104] this Court will not imply additional exceptions to application of the federal equal employment statutes.[105]

In further support of its argument that Title VII does not apply to the Mission's employment activities, the defendant cites the Restatement of Foreign Relations Law, which provides that a "host state may apply general laws even to diplomatic and consular activities of foreign states.... However, international law accords to a foreign state immunity from the application of certain laws of the host state in respect of the property, papers, and personnel of its diplomatic and consular missions: for example, ... taxes and employment regulations...."[106] The Reporters' Notes to Sections 461 and 464 of the Restatement indicate, however, that the taxes and employment regulations to which that comment refers include social security provisions and unemployment taxes,[107] but not labor laws.[108]

Title VII was enacted to eliminate discrimination in the workplace. As its title makes clear, it is more than an employment regulation—it is a civil rights law that focuses on equal employment opportunity. The Mission's reliance on the aforementioned comment as support for the proposition that Title VII should not be applied to foreign diplomatic missions operating in the United States is misplaced.

## 2. The New York State Human Rights Law

With regard to the New York State Human Rights Law ("HRL") the Mission asserts, first, that because the HRL does not expressly apply to foreign diplomatic missions this Court should not read the

---

**103.** A court may apply the common law maxim *expressio unius est exclusio alterius* to aid in statutory construction and reasonably draw an inference of intent to exclude a particular result from Congress' failure to expressly proscribe that result. *See, e.g., Duke v. University of Texas at El Paso,* 663 F.2d 522, 526 (5th Cir.1981) ("The maxim embodies a sensible insight into the customary manner in which language is used to communicate ideas. Simply stated, it expresses the learning of common experience that generally when people say one thing they do not mean something else.") (internal quotations and citations omitted).

**104.** *See McKennon v. Nashville Banner Publ'g Co.,* 513 U.S. 352, 358, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995) ("Congress designed the remedial measures of [Title VII] to serve as a 'spur or catalyst' to cause employers to 'self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges' of discrimination.") (quoting *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 417–18, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)); *see also Herman & MacLean v. Huddleston,* 459 U.S. 375, 387 n. 23, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (canons such as *expressio unius est exclusio alterius* have long been subordinated to the

doctrine that courts will construe details of an act in conformity with its dominating general purpose).

**105.** *Cf. Andrus v. Glover Constr. Co.,* 446 U.S. 608, 616, 100 S.Ct. 1905, 64 L.Ed.2d 548 (1980).

**106.** RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 461 cmt. b (1987).

**107.** *Id.* § 464 n. 4(c) ("Under United States law, foreign governments ... are exempt from social security payments and unemployment tax, and diplomatic and consular personnel ... are exempt from social security tax."). The Court notes that plaintiff's employment contract provides that, "[s]hould the laws in the country in which the employment is conducted require[ ] medical and social security, then the [Saudi Arabian Ministry of Foreign Affairs] bears the monthly installment payments on behalf of [plaintiff] ...." Pl. Mem., Ex. A, ¶ 13.

**108.** *Id.* § 461 n. 3(v) ("In several cases involving employees working in ... subsidiaries of foreign state instrumentalities, the National Labor Relations Board held that United States labor laws were applicable....").

statute to cover the Mission's employment activities.[109] For the reasons set forth above, namely, that such an interpretation of the HRL would be counter to established maxims of statutory construction and, in any case, the FSIA provides that foreign states not entitled to immunity from suit are liable in the same manner as private individuals, this argument has no merit.

 Second, the Mission contends that to allow a claim against a foreign diplomatic mission under the New York statute would violate the United States Constitution, which allocates foreign affairs powers exclusively to the federal government.[110] The Constitution does indeed reserve foreign affairs powers to the President and Congress.[111] State laws that intrude into the field of foreign affairs, therefore, have been found unconstitutional[112] and preempted by federal law.[113] In order to intrude or be preempted, however, a state statute must legislate in an area reserved to or occupied by federal law.

 The HRL does not intrude on foreign affairs powers reserved to the federal government. The fact that a foreign government or diplomatic mission that is not entitled to immunity under the FSIA might be found liable under this statute, in the same manner and to the same extent as a private individual, does not lead automatically to the conclusion that the state law intrudes on the foreign affairs powers of the federal government. Cases in which state or local laws have been found to intrude on federal foreign affairs powers in this manner involve statutes that directly conflict with federal law,[114] have the potential to embarrass or offend other nations,[115] or, at the very least, have more than "some incidental or indirect effect in foreign countries."[116] For example, in *Zschernig v. Miller*[117] the Supreme Court found that an Oregon probate statute intruded into the field of foreign affairs reserved to the federal government because the statute required nonresident aliens, as a condition of inheritance, to prove that U.S. heirs would have a reciprocal right to take property from estates in their country and that no part of the foreign heirs' inheritance would be confiscated by the government of the foreign country.[118] The Court found that this "led into minute inquiries concerning the actual administration of foreign law"[119] and had "great potential for disruption or embarrassment."[120]

109. Def.Mem. 21.

110. *Id.*

111. *See, e.g.*, U.S. CONST. art. I, § 8; art II, § 3.

112. *See, e.g., Zschernig v. Miller*, 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968).

113. *See, e.g., Crosby v. National Foreign Trade Council*, —— U.S. ——, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000).

114. *See id.* at 2302.

115. *See, e.g., New York Times Co. v. City of New York Comm'n on Human Rights*, 41 N.Y.2d 345, 393 N.Y.S.2d 312, 361 N.E.2d 963 (1977).

116. *See Clark v. Allen*, 331 U.S. 503, 517, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947).

117. 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968).

118. *Id.* at 430 n. 1, 88 S.Ct. 664.

119. *Id.* at 435, 88 S.Ct. 664.

120. *Id.* Other state or local ordinances that have been found to intrude on federal foreign affairs powers include an Illinois statute that created an exemption from state occupation and use taxes for coins and currency issued by any country except South Africa, *Springfield Rare Coin Galleries, Inc. v. Johnson*, 115 Ill.2d 221, 104 Ill.Dec. 743, 503 N.E.2d 300 (1986), New Mexico State University's decision to deny admission or readmission to any Iranian students until Iran released the American hostages in 1980, *Tayyari v. New Mexico State University*, 495 F.Supp. 1365 (D.N.M. 1980), and New York's antidiscrimination laws as applied to ban advertisements of employment opportunities in South Africa, *New York Times Co.*, 41 N.Y.2d 345, 393 N.Y.S.2d 312, 361 N.E.2d 963 (1977).

New York's HRL would have to have a more significant and direct effect in foreign countries than it does in order to be found similarly intrusive in the field of foreign affairs. The HRL is a statute of general application that does not curtail the rights of foreign citizens or attempt to structure a relationship between New York, its residents, and any other country.[121] Nor does it require inquiries into the actual administration of foreign law that would be unduly critical, offensive, or embarrassing.[122] Rather, the purpose of the HRL is to protect the general public welfare by assuring that "every individual [in New York] is afforded an equal opportunity to enjoy a full and productive life," which, in the opinion of the state legislature, requires the elimination and prevention of discrimination in employment.[123] Application of the HRL to employers in New York, even including the Mission, has no more than an indirect effect in Saudi Arabia. In consequence, the Court does not find that the HRL intrudes unconstitutionally on the federal foreign affairs powers.

The Mission points to the Supreme Court's recent ruling in *Crosby v. National Foreign Trade Council*[124] in support of its argument that the HRL should not be applied to foreign governmental entities. The Court there held that a Massachusetts law barring state entities from buying goods or services from companies doing business with or in Burma conflicted with a federal statute imposing a set of mandatory and conditional sanctions on Burma and therefore was unconstitutional under the Supremacy Clause.[125] As the foregoing makes clear, however, *Crosby* differs significantly from the case currently before this Court in that the state law at issue in *Crosby* directly conflicted with a specific federal act and was preempted by Congress' specific delegation of power to the President.[126] The HRL, on the other hand, does not directly conflict with any federal law, foreign affairs-related or otherwise.

The HRL, as applied to this case, is not preempted by federal law and does not intrude on the foreign affairs powers reserved to the federal government.

## D. Plaintiff's Retaliation Claims

Defendant asserts that even if the Court finds that it has jurisdiction over plaintiff's discriminatory discharge claims, there is no jurisdiction over plaintiff's post-discharge retaliation claims because the alleged retaliatory conduct is not "commercial activity" as defined in the FSIA.[127]

Accepting the factual allegations set forth in the complaint as true, and drawing

**121.** *See Board of Trustees of Employees' Retirement System of the City of Baltimore v. Mayor and City Council of Baltimore City*, 317 Md. 72, 130, 562 A.2d 720, 748 (1989) (observing that *Springfield Rare Coin Galleries, Inc.*, *New York Times Co.*, and *Tayyari* each involved state or local efforts to structure relationships between their residents and other nations, or citizens of other nations, or action directly aimed at certain foreign nations or their citizens), *cert. denied*, 493 U.S. 1093, 110 S.Ct. 1167, 107 L.Ed.2d 1069 (1990). The Maryland Court of Appeals found that city ordinances requiring city pension funds to divest their holdings in companies doing business in South Africa did not intrude on the federal government's exclusive power to conduct foreign relations because they were an attempt by the city to structure its own financial affairs and did not curtail the rights of South Africa, its citizens, or any foreign national, had only a tangential effect on economic relations between American and South African businesses or governments, had a minimal impact on foreign affairs, and had only an incidental or indirect effect in foreign countries. *Id.*

**122.** *See Zschernig*, 389 U.S. at 434–35, 88 S.Ct. 664; *New York Times Co.*, 41 N.Y.2d at 353, 393 N.Y.S.2d at 318, 361 N.E.2d 963.

**123.** N.Y.Exec.Law § 290(3).

**124.** —— U.S. ——, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000).

**125.** *Id.* 120 S.Ct. at 2302.

**126.** *Id.*

**127.** Def.Mem. 11 n. 5.

474

all reasonable inferences in favor of plaintiff, the Court finds that the retaliation claims, like the discriminatory discharge claims, are based upon plaintiff's employment by the Mission. The Court previously has held that plaintiff adequately alleges that her employment constituted commercial activity within the meaning of the FSIA, and it is clear that under the FSIA the Mission is not entitled to immunity in any action based upon that commercial activity.[128] In consequence, this Court has jurisdiction over plaintiff's retaliation claims.

*Shalaby v. Saudi Arabian Airlines*[129] is not to the contrary. The cause of action in *Shalaby* was not based on Shalaby's employment with Saudi Arabian Airlines ("SAL"), but rather was a tort action for defamation and intentional infliction of emotional distress.[130] The court in that case found that the allegedly defamatory statements were not made by SAL to further SAL's business or for any other commercial purpose, but instead were made "with the sole motivation of injuring [Shalaby's] business reputation."[131] The plaintiff therefore was barred from relying on the commercial activity exception to immunity.[132] The facts in the instant case are markedly different, primarily because the Court has found that the action before it is based upon commercial conduct by the

Mission and satisfies the requirements of Section 1605(a)(2).

■ Defendant's argument that it is entitled to immunity from plaintiff's retaliation claims because they are comprised, in part, of her alleged defamation by the Mission is equally unavailing.[133] As the D.C. Circuit recently stated, "defamation is not an 'exception to the exception' for commercial activity."[134] The non-commercial tort exception to immunity found in Section 1605(a)(5) contains an exception for claims "arising out of . . . libel, slander, misrepresentation, deceit or interference with contract rights; . . . ."[135] Sections 1605(a)(5) and 1605(a)(2) are, however, mutually exclusive[136] and there is no similar defamation exception for tort claims arising from commercial activity.[137] Thus, even if plaintiff's retaliation claims include allegations of defamation by the Mission, they are within the jurisdiction of this Court.

*E. Mukaddam's Demand for a Jury Trial*

Finally, defendant moves to strike plaintiff's jury demand. Plaintiff concedes that there is no right to a jury trial in an action against a foreign state.[138] The jury demand is therefore stricken.

**128.** *See* 28 U.S.C. § 1605(a)(2).

**129.** No. 97 Civ. 9393(DC), 1998 WL 782021 (S.D.N.Y. Nov. 9, 1998).

**130.** *See id.* at *1.

**131.** *Id.* at *4.

**132.** *Id.*

**133.** Def.Mem. 11 n. 5.

**134.** *El–Hadad,* 216 F.3d at 35.

**135.** 28 U.S.C. § 1605(a)(5).

**136.** *See El–Hadad,* 216 F.3d at 36; *Letelier v. Republic of Chile,* 748 F.2d 790, 795 (2d Cir. 1984), *cert. denied,* 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985).

**137.** *See El–Hadad,* 216 F.3d at 35.

**138.** Pl.Mem. 14; *see* 28 U.S.C. § 1330(a) (granting district courts jurisdiction over "any nonjury civil action against a foreign state" in which the foreign state is not entitled to immunity); *Rein v. Socialist People's Libyan Arab Jamahiriya,* 162 F.3d 748, 754 n. 2 (2d Cir.1998) (interpreting Section 1330(a) to mean that all civil actions brought against foreign states "are to be tried without juries"), *cert. denied,* 525 U.S. 1003, 119 S.Ct. 2337, 144 L.Ed.2d 235 (1999); *see also* H.R.Rep. No. 94–1487, at 13 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6611 ("As in suits against the U.S. Government, jury trials are excluded. Actions tried by a court without a jury will tend to promote a uniformity in decision where foreign governments are involved.") (citations omitted).

*Conclusion*

Defendant's motion is granted to the extent that plaintiff's jury demand is stricken and is denied in all other respects.

SO ORDERED.