Yuka KATO, Plaintiff–Appellant,

v.

Shintaro ISHIHARA, Governor, and Tokyo Metropolitan Government, Defendants–Appellees.

No. 03–7173.

United States Court of Appeals, Second Circuit.

Argued: Oct. 24, 2003.

Decided: Feb. 18, 2004.

F. Frederic Fouad, New York, NY, for Plaintiff–Appellant.

Andrew J. Bernstein (Cindy L. Caplan, of counsel), Pillsbury Winthrop LLP, New York, NY, for Defendants–Appellees.

Before: McLAUGHLIN, CABRANES, and SACK, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge.

The principal question presented by this appeal is whether, in the circumstances alleged, defendants—the governor and municipal government of the city of Tokyo, Japan—are immune under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*, from plaintiff's sexual harassment suit. We consider an appeal from a judgment of the United States District Court for the Southern District of New York (Richard M. Berman, *Judge* ), *Kato v. Ishihara*, 239 F.Supp.2d 359 (S.D.N.Y.2002), which granted defendant Tokyo Metropolitan Government's ("TMG's") motion to dismiss plaintiff's complaint. Plaintiff alleged that she was the victim of sexual harassment and retaliation during the course of her employment by TMG, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, as well as of New York state and local human rights laws.

■ The FSIA codifies the "restrictive theory of sovereign immunity," *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 488, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983), under which foreign sovereigns and their "agenc[ies] or instrumentalit[ies]," 28

U.S.C. § 1603,[1] enjoy immunity from suit in United States courts, subject to a few, enumerated statutory exceptions. *See* 28 U.S.C. § 1604; *Verlinden,* 461 U.S. at 488, 103 S.Ct. 1962. Among these exceptions, the FSIA provides that sovereigns have no immunity from suits "based upon [ ] commercial activity carried on in the United States ...." 28 U.S.C. § 1605(a)(2). Accordingly, whether a United States court may adjudicate a suit against a sovereign depends on the character of the sovereign's activity that is the subject of the suit: As a general rule, if a sovereign is sued on the basis of conduct that is "commercial," then the suit falls into the FSIA's "commercial activity" exception to sovereign immunity, and it may go forward; if the suit pertains to activity that is not "commercial," then the trial court must dismiss the suit for lack of subject matter jurisdiction under the general rule of sovereign immunity enacted in the FSIA.[2]

Plaintiff argues that TMG's activities in the United States, including the duties she performed in the United States as a TMG employee, described *post,* constitute "commercial activity" within the meaning of the FSIA's "commercial activity" exception to sovereign immunity. Appellant's Br. at 10–15. By thus engaging in "commercial activity" in the United States, according to plaintiff, defendants have forfeited their immunity and exposed themselves to liability under United States laws prohibiting sexual harassment. *Id.*

Defendants argue that, whatever the general character of their activities in the United States, their employment of plaintiff was not "commercial" under the FSIA, because plaintiff is a member of the Japanese "civil service." Appellees' Br. at 11–14. They urge that, because of her status as a civil servant, they are immune from suit on the basis of her employment, regardless of whether they are immune from suit on the basis of their "commercial" endeavors. *Id.*

We hold that TMG's employment of plaintiff is not "commercial" for the purpose of the FSIA's "commercial activity" exception to sovereign immunity. Accordingly, we affirm the District Court's dismissal of plaintiff's claims on the basis of defendants' sovereign immunity under the FSIA, though on somewhat different grounds than those of the District Court.[3]

---

1. The District Court found that TMG was an "agency or instrumentality" of a foreign state for purposes of immunity under the FSIA, *see Kato v. Ishihara,* 239 F.Supp.2d 359, 362 n. 2 (S.D.N.Y.2002), and that the same principles of immunity applied to Ishihara as an agent of a foreign state acting in his official capacity, *id.* at 363. Plaintiff does not dispute either of these conclusions on appeal.

2. Sovereign immunity existed in the common law of the United States long before the enactment of the FSIA. *See Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). Prior to the FSIA's enactment, it was the longstanding practice of United States courts to defer to the executive branch in questions of immunity. *See id.* The FSIA "was designed to codify the restrictive theory of sovereign immunity

[that had previously been implemented by the executive branch] and to remove the subject from diplomatic pressures by transferring ... decisions [about sovereign immunity] to the judiciary." *Abrams v. Société Nationale des Chemins de Fer Francais,* 332 F.3d 173, 178 (2d Cir.2003). For a concise history of the principle of sovereign immunity and its statutory history in the United States, see, for example, *Verlinden,* 461 U.S. at 486–89, 103 S.Ct. 1962 (tracing the history of sovereign immunity in the course of a decision upholding the constitutionality of the FSIA); *Abrams,* 332 F.3d at 176–78.

3. Because we affirm this holding of the District Court, we should not, and do not, teach its alternative bases for dismissal of plaintiff's claims.

## BACKGROUND

Plaintiff is a Japanese citizen employed by TMG under the terms of Japanese laws governing "local public servants." Those laws provide terms of employment that include, *inter alia,* qualification by competitive examination, guaranteed lifetime tenure (absent fault), and a prescribed rotation of employment placements. Plaintiff was assigned to the New York office of TMG in 1998 as part of a standard rotation. There, her duties included promotional activities on behalf of Japanese companies, such as manning booths at trade shows to promote specific products. She also created marketing reports of interest to Japanese companies. In March 2000, plaintiff's rotation in TMG's New York office ended, and she was transferred by TMG to the Tokyo Metropolitan University.[4]

Plaintiff alleges that she was a victim of sexual harassment while she was stationed at TMG's New York office, and of retaliation upon her return to Tokyo. Plaintiff filed claims under Title VII, New York State Human Rights Law, N.Y. Exec. Law § 291 *et seq.,* and the Administrative Code of the City of New York, § 8–107. *Kato,* 239 F.Supp.2d at 361. Defendants moved to dismiss the claims pursuant to Fed. R.Civ.P. 12(b)(1) (lack of subject matter jurisdiction), 12(b)(2) (lack of personal jurisdiction), and 12(b)(6) (failure to state a claim upon which relief can be granted). *Id.*

The District Court granted defendants' motion to dismiss on the basis, *inter alia,* that the District Court lacked subject matter jurisdiction because, under the FSIA, Ishihara and TMG are immune from suits in American courts brought by "civil service" employees on the basis of their employment. Specifically, the District Court held that defendants' activity did not subject them to suit under the "commercial activity" exception to the FSIA because the legislative history of the FSIA clearly stated that the "employment of . . . civil service [personnel]" is a "governmental" rather than a "commercial" activity. *See Kato,* 239 F.Supp.2d at 363 (citations omitted).

On appeal, plaintiff argues that, despite her status under Japanese law as a civil servant, the duties she performed for TMG in New York City were primarily "commercial" in nature, including prominently the sale and promotion of Japanese products. According to plaintiff, the case law applying the "commercial activity" exception to immunity to employees of foreign governments compels the conclusion that she is not a "civil service" employee within the meaning of the legislative history of the FSIA, and, therefore, that her suit falls within the "commercial activity" exception to immunity under the FSIA. Therefore, she argues, the District Court has jurisdiction over her claims against TMG and Ishihara.

## DISCUSSION

We review district court determinations on motions to dismiss and motions for summary judgment *de novo. See, e.g., Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 300 (2d Cir.2003).

## I. FSIA

### A. General Rule

The FSIA provides that "a foreign state shall be immune from the jurisdiction of

---

4. In February 2001, plaintiff took medical leave from TMG, and in October 2001 she left Japan for New York City to receive medical treatment. At the time she filed her lawsuit, plaintiff resided in New York City, but she remained on medical leave from TMG, and she had conveyed to TMG her intention to resume her work for them after her medical leave.

the courts of the United States and of the States" unless the circumstances of the suit fall into a specific statutory exception. *See* 28 U.S.C. § 1604.

## B. "Commercial Activity" Exception

Plaintiff argues that TMG nevertheless has no immunity in the instant case, because this suit falls within the FSIA's statutory exception to immunity for foreign states engaging in "commercial activity," which provides that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case ... (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state ...." 28 U.S.C. § 1605(a). The FSIA defines "foreign state" to include an "agency or instrumentality" of a foreign state, 28 U.S.C. § 1603(a), and, as noted above, *see* note 1 *ante,* the parties do not dispute that both TMG and Ishihara should be treated as a "foreign state" for purposes of the FSIA. Finally, the statutory definition of "commercial activity" provides only that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id.* § 1603(d).

## C. Legislative History

The House Report on the bill that became the FSIA explicitly asserts the congressional intention to leave to the "courts ... a great deal of latitude in determining what is a 'commercial activity' for purposes of [the FSIA]." H.R.Rep. No. 94–1487, at 16 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6615. The same House Report identifies the employment of civil service personnel as an example of a "governmental" rather than "commercial" activity, *id.* ("Also public or governmental and not

commercial in nature, would be the employment of diplomatic, civil service, or military personnel ....."), but it does not define "civil service." Thereafter, it lists as examples of "commercial activity" a sovereign's "employment or engagement of laborers, clerical staff or public relations or marketing agents." *Id.*

## II. District Court Opinion

In holding that the FSIA's commercial activity exception did not apply to plaintiff's suit, the District Court relied primarily on the opinion of the District Court in *Mukaddam v. Permanent Mission of Saudi Arabia to the United Nations,* 111 F.Supp.2d 457 (S.D.N.Y.2000), which concluded that "[t]he legislative history of the FSIA indicates that Congress considered the employment of 'diplomatic, civil service, or military personnel' to be 'governmental and not commercial in nature.'" *Mukaddam,* 111 F.Supp.2d at 463 (quoting H.R.Rep. No. 94–1487, at 16, *reprinted in* 1976 U.S.C.C.A.N. at 6615), *quoted in Kato,* 239 F.Supp.2d at 363. Accordingly, the District Court held that, because Kato is undisputedly a civil servant under Japanese law, *Kato,* 239 F.Supp.2d at 363, because her employment is subject to terms that are characteristic of public service, *id.,* and because the legislative history of the FSIA establishes that Congress did not intend to subject foreign governments to the jurisdiction of United States courts for suits involving the employment of "civil service," Kato's employment does not fall into the "commercial activity" exception to the FSIA.

## III. Analysis

■ The text of the FSIA is central to our interpretation of what constitutes "commercial activity" under that statute. The FSIA provides that "[t]he commercial character of an activity shall be deter-

mined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). Rather than provide further definitional guidance, the legislative history of the FSIA provides a few examples of "commercial" and "governmental" activity, explicitly leaving to courts the responsibility for determining the scope of "commercial activity" for the purpose of FSIA immunity. *See* H.R.Rep. No. 94–1487, at 16, *reprinted in* 1976 U.S.C.C.A.N. at 6615 (noting that "courts would have a great deal of latitude in determining what is a 'commercial activity' for the purposes of [the FSIA]."). Among the examples listed, the House Report on the FSIA notes the "employment of ... civil service ... personnel" as an example of activity that is "governmental." *Id.* It then states that employment of other types of workers—specifically, *inter alia,* "marketing agents"—is "commercial." *Id.*

Under the FSIA, suits against sovereign employers have focused on certain examples of "commercial" and "governmental" employment, each party characterizing a plaintiff's employment as belonging to one or another category listed in the legislative history, *e.g.,* "civil service," "marketing agent," or "clerical staff." Here, Kato was employed in activities related to marketing and business, but was concededly a "civil servant" under Japanese law and subject to many of the protections afforded the Japanese civil service. Understandably, each of the parties before us seizes on those attributes of Kato's position that seemingly fall into one or the other category to argue that Kato is either a "civil service" or a "marketing" employee. The "civil service" and "marketing agent" categories of employment are, however, merely examples of the broader distinction made in the text of the FSIA between activities that are by nature "commercial" and those

that are not—the central inquiry in this case.

■ The Supreme Court has explained that "a state engages in commercial activity under the ... theory [of sovereign immunity codified in the FSIA] where it exercises 'only those powers that can also be exercised by private citizens,' as distinct from those 'powers peculiar to sovereigns.'" *Saudi Arabia v. Nelson,* 507 U.S. 349, 360, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993) (quoting *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 614, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (citation and internal quotation marks omitted)). Put another way, to identify "commercial activity" for purposes of the "commercial activity" exception to immunity under the FSIA, we must ask whether "the particular actions that the foreign state performs ... are the *type* of actions by which a private party engages in trade and traffic or commerce." *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 614, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (citation and internal quotation marks omitted); *see also Weltover, Inc. v. Republic of Argentina,* 941 F.2d 145, 149–50 (2d Cir.1991). Accordingly, in order to evaluate plaintiff's argument that her employment was by nature "commercial" because she engaged in "commercial activity" on behalf of TMG, we consider whether TMG's activities in New York were typical of a private party engaged in commerce.

The record reveals that TMG performed actions that were only superficially similar to actions typically undertaken by private parties. According to Kato's declaration, TMG engaged in "product promotion for Japanese companies, general business development assistance, participation in trade shows on behalf of the companies to promote those companies' products for sale, and leasing office space to those companies for their business development."

Although a private Japanese business might engage in these activities on its own behalf—for example, by sending its representatives to trade shows in the United States to promote its products—such a business would not typically undertake the promotion of other Japanese businesses, or the promotion of Japanese business interests in general.

In other words, the fact that a government instrumentality like TMG is engaged in *the promotion of commerce* does not mean that the instrumentality is thereby engaged in *commerce*. The promotion abroad of the commerce of domestic firms is a basic—even quintessential—governmental function. For example, the United States Department of Commerce is charged by statute with the "duty . . . to foster, promote, and develop the foreign and domestic commerce, the mining, manufacturing, and fishery industries of the United States." 15 U.S.C. § 1512. Indeed, many agencies of the United States have some role in the direct or indirect promotion of American commerce overseas. *See, e.g.,* 12 U.S.C. § 635(a)(1) (stating that the "objects and purposes" of the United States Export–Import Bank "shall be to aid in financing and to facilitate exports and imports and the exchange of commodities and services between the United States . . . and any foreign [country] or the agencies and nationals thereof"); 15 U.S.C. § 4721(a)-(b) (providing for the establishment within the International Trade Administration of "the United States and Foreign Commercial Service" for the primary purposes of "the promotion of exports of goods and services from the United States . . . and . . . the protection of United States business interests abroad"); The American Embassy in Paris: Our Mission, *at* http://www.amb-usa.fr/mission2.htm (last visited Feb. 3, 2004) (describing "support [of] U.S. businesses" as an "[e]ssential [s]er-

vice[ ]" provided by the U.S. Embassy in Paris); Office of the United States Trade Representative, *at* http://www.ustr.gov/about-ustr/index.shtml (last visited Feb. 3, 2004) ("[T]he USTR and the Agency's staff are responsible for developing and implementing trade policies which promote world growth, and create new opportunities · for American businesses, workers and agricultural producers."). Agencies of foreign governments do not undertake "commercial activit[ies]" merely by engaging in these basic and routine trade promotional activities.

We therefore hold that TMG was not involved in a "commercial activity" under the FSIA when it provided general business development assistance, including product promotion, to Japanese businesses seeking to engage in commerce in the United States. Accordingly, we reject plaintiff's argument that her involvement in such activities on TMG's behalf rendered her employment "commercial" under the FSIA.

 Furthermore, we observe that, where courts identify "governmental" or "non-commercial" activity by reference to the category "civil service" identified by the House Report of the FSIA, the category of "civil service" should be interpreted to include the broad range of civil service employment relationships used by countries other than the United States. Several courts applying the commercial activity exception to the FSIA have inquired whether a plaintiff's employment bore the hallmarks of current civil service employment in the United States. *See Kato,* 239 F.Supp.2d at 363 (noting, *inter alia,* that Kato was required to pass a competitive examination to obtain her employment, that she was thereafter guaranteed lifetime employment, and that she was transferred based on an established rotation

system); *see also Holden v. Canadian Consulate*, 92 F.3d 918, 921 (9th Cir.1996) (observing that the plaintiff "did not compete for any examination prior to being hired, was not entitled to tenure, was not provided the same benefits as foreign service officers and did not receive any civil service protections from the Canadian government"); *Mukaddam*, 111 F.Supp.2d at 463 (considering, among other factors, "whether the employee competed for an examination prior to being hired, was entitled to tenure, was provided the same benefits as foreign service officers, or received civil service protections from the hiring government"). Although the characteristics of American civil service employment today—such as competitive examinations or guarantees of job security—may in some instances be helpful in determining whether an employment relationship is "governmental" rather than "commercial," they do not necessarily resolve the question whether a particular employment relationship is an example of "civil service." Other countries are free to structure employment relationships in ways that do not mimic civil service protections now common to the United States and many European states, without thereby sacrificing the immunity conferred by the FSIA, as long as the sovereign, by extending the employment, is engaging in "governmental" rather than "commercial" activity.

Indeed, the civil service of the United States did not assume its modern characteristics until the enactment in 1883 of the Pendleton Act, ch. 27, 22 Stat. 403, which provided that certain government jobs would be "classified," or awarded on the basis of competitive examinations, *id.* § 2.

Prior to the Pendleton Act, appointment to civil service jobs was left to the discretion of the President. In 1832, Senator William L. Marcy, defending Andrew Jackson's nomination of Martin Van Buren as Minister to Great Britain, famously coined a phrase to justify the prevailing method of allocating government jobs: "They see nothing wrong in the rule that to the victor belong the spoils of the enemy." *See* U.S. Office of Personnel Management, Biography of an Ideal: A History of the Federal Civil Service, ch. 1 at 12 (2003). The movement to reform the "spoils system" after the Civil War was galvanized by the fatal shooting of President James A. Garfield, on July 2, 1881, by Charles J. Guiteau, almost invariably described in United States history textbooks as a disappointed or disgruntled office seeker. *See id.* at ch. 1, p. 32; Mary Beth Norton *et al.*, A People and a Nation: A History of the United States 559 (6th ed.2001) (describing Guiteau as "a disappointed patronage seeker"). The Pendleton Act was passed shortly thereafter, establishing a Civil Service Commission to administer competitive examinations. *See* 22 Stat. 403.

It would be a mistake to assert that the United States did not have a "civil service" before the enactment of the Pendleton Act or before it adopted certain characteristics today common to developed and democratic countries. It would also be incorrect to conclude that the American civil service system—even after the Pendleton Act, which left numerous government jobs unclassified, and contained only narrow restrictions on terminating even classified employees, *id.* § 2[5]—has exhibited a fixed and definitive set of characteristics against

---

**5.** Among those holding "unclassified" positions in the American bureaucracy are those appointees of the President and his subordinates often described as "political" appointees, including, for example, Assistant Secretaries of Cabinet departments—none of whom is appointed on the basis of examination and none of whom has job security, but all of whom are members of our country's "civil service" for purposes of United States claims to immunity from civil actions abroad.

which other countries' civil service systems should be measured under the FSIA. In light of the history of civil service in this country, it would similarly be shortsighted to characterize as noncommercial only those foreign civil service systems that are free of patronage; of appointment on the basis of factors we might regard as inappropriate (such as family or tribal relationships); or, indeed, of any of a wide variety of unwholesome practices. In determining whether a foreign government's employment of personnel in the United States is "civil service," and therefore "governmental," we do not look principally to whether that employment resembles the contemporary civil service of the American democracy, but we instead inquire whether "the particular actions that the foreign state performs ... are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (citation omitted).[6]

## CONCLUSION

Accordingly, we affirm the District Court's holding that defendants are immune under the FSIA from a suit arising from Kato's employment. Specifically, we hold that an agency of a foreign government is not involved in "commercial activity" under the FSIA when it provides general business development assistance, including product promotion, to business enterprises of that country seeking to engage in commerce in the United States.

---

6. We therefore decline to adopt the approach to the "civil service" language of the House Report of the FSIA, taken by the District Court, that relies on whether certain familiar indicia of "civil service" are present. *See Kato*, 239 F.Supp.2d at 363; *see also Holden*, 92 F.3d at 921; *Mukaddam*, 111 F.Supp.2d at 463.